JH **FILED**

SEP 2 0 2007 NA

SEP. 20, 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCHOLASTIC INC, | ) |
| Plaintiff, | ) ) ) |
| V. | ) 07CV 5330 |
| INFINITY RESOURCES, INC. d/b/a DEEPDISCOUNT.COM, | ) JUDGE PALLMEYER ) MAGISTRATE JUDGE SCHENKIER |
| Defendant. | ) ) |

## COMPLAINT

Plaintiff Scholastic Inc. ("Scholastic") by its attorneys, for its complaint against Defendant Infinity Resources, Inc. ("Infinity"), alleges as follows:

### THE PARTIES

1. Plaintiff Scholastic is a New York corporation with its principal place of business at 557 Broadway, New York, New York, 10012. Scholastic is and, at all times material herein, was engaged in the business of, among other things, publishing and distributing books for children and related merchandise. Scholastic has the exclusive right to publish *Harry Potter and the Deathly Hallows* in the United States, as well as the first six books in the Series,

2. Defendant Infinity Resources, Inc. (d/b/a DeepDiscount.com) is an Illinois corporation with its principal place of business at 900 N. Rohling Road, Itasca, Illinois 60143. Infinity is an internet marketer and maintains an internet retail website at www.DeepDiscount.com.

### NATURE OF THE ACTION

3. This action arises out of Infinity's flagrant violation of its strict contractual obligations to refrain from shipping or allowing to be shipped or otherwise distributing *Harry*

173285_1.DOC

*Potter and the Deathly Hallows* ("the Book"), the last volume of Plaintiff's highly acclaimed *Harry Potter* series of children's books (the "Series" or the "Books") by J.K. Rowling to the public until the worldwide on-sale date of July 21, 2007.

4. The seventh (and last) book in the Series was scheduled for simultaneous publication in the English language, throughout the world, at 12:01 a.m. on July 21, 2007. This release was a highly-anticipated event around the world and has received tremendous press coverage. The Book was subject to a worldwide embargo until that time. In the United States, none of the approximately 12 million books in the first announced printing were to be sold or delivered to customers until 12:01a.m. July 21, 2007. Distributors and retailers all signed special contracts "embargoing" the books until that date and virtually no details regarding the highly anticipated release were disclosed by the author J.K. Rowling or her publishers.

5. In a complete and flagrant violation of the agreement that it knew was part of the carefully constructed release of this eagerly awaited Book, Infinity ignored the strict contractual requirements to which it expressly agreed, which were fashioned to protect Scholastic's distribution plans and enforce author Rowling's right of first publication under the U.S. Copyright Act.

6. Infinity shipped or caused to be shipped, on information and belief, thousands of copies of *Harry Potter and the Deathly Hallows* up to a week before the contractually permitted shipping date, thereby causing damage to Scholastic, and its relationships and reputation with its authors, distributors and retailers nationwide. In addition, Infinity's completely unauthorized breach endangered Scholastic's efforts and those of the author and the author's other publishers to maintain the surprise of the Book so that all of the Harry Potter fans around the world could learn its contents at the same time and by reading the book itself. In

addition, this breach caused Scholastic and others to incur expenses to mitigate the damages caused by Infinity.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over defendant Infinity because it is a corporation doing business within the State of Illinois and it has made or performed a contract substantially connected with Illinois.

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of New York, Defendant is a citizen of Illinois, and the amount in controversy exceeds $75,000 exclusive of interest or costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## FACTS

10. Since the fourth book in the *Harry Potter* series, the books have all been embargoed prior to their worldwide release. In book publishing, an embargoed book is one that the author and publisher decide should not be put out for sale in book stores or other venues until a particular date in order to protect its contents from premature release. All the sales venues as well as the printing and other vendors are contractually obligated to preserve the confidentiality of the book until what is called the laydown date, the date the book is to be put out for sale. The *Harry Potter* Books are unusual in that they had not only a laydown date, but a time—12:01 a.m. This is to allow all the readers to experience the books at the same time at the midnight parties or sleepovers or wherever they choose in accordance with the publishers' plans and the author's expressed wishes.

11. For the past several months, Scholastic worked with national and local retail promoters on the launch of *Harry Potter and the Deathly Hallows*. Scholastic's marketing

3

plan, based on the theme "THERE WILL SOON BE 7," was centered on the Book's 12:01 a.m. July 21 release and the mysteries that were to be resolved at that time.

12. Author Rowling's revelation of the few meager details of this final book in the series, including its title, were met with extraordinary public interest. In the one month from the date Rowling revealed the title on her website the site received 259 million "hits" and the event merited worldwide press coverage.

13. Scholastic and Rowling worked hard to ensure that all of the content of *Harry Potter and the Deathly Hallows* remained secret until the book's official release. Rowling refused to discuss *Harry Potter and the Deathly Hallows* in any detail in media interviews and her fans, in general, did not want "spoilers" about what will happen in *Harry Potter and the Deathly Hallows*. In addition, Scholastic's own website, Scholastic.com, received approximately 9.5 million hits from fans interested in discussing the Book and the Series and expressing their wishes not to learn of the Book's contents before its scheduled publication. The Book's fans fervently supported and respected Rowling's wish to keep details about the book secret until publication.

## Scholastic's Extraordinary Security Measures

14. Scholastic implemented numerous security measures to prevent pre-publication leaks of any details regarding *Harry Potter and the Deathly Hallows*. Among other things, Scholastic severely restricted access to the book solely to individuals with a need to know, stored drafts and finished copies of the book in a safe or locked facility, utilized confidential tracking codes for shipments of the finished book and declined to send out pre-publication review copies (which is highly unusual in the publishing industry).

15. Scholastic entered into agreements with distributors and booksellers that obligated those parties to store copies of the book securely and not to release any copies to the public before 12:01 a.m. on July 21, 2007. In addition, Scholastic's contracts with distributors and retailers expressly required that for any shipments to customers to occur before July 20, 2007, each distributor and/or retailer was obligated to obtain Scholastic's prior written approval, an approval that required a review of that retailer's shipping plans to avoid early receipt of the Book by its readers.

16. Scholastic also entered into strict confidentiality agreements with all of the third parties with whom it contracts to provide services in connection with *Harry Potter and the Deathly Hallows*, including those responsible for printing, storing and shipping the books specifically prohibiting these third parties from disclosing any materials or information relating to the book.

## The Infinity Contract

17. On or about March 10, 2007, along with Scholastic's other retailers nationwide, Infinity signed a contract obligating it to comply with the worldwide embargo for the sale and shipment of Harry Potter and the Deathly Hallows (the "Infinity Embargo Agreement" attached hereto as Exhibit A.) The Infinity Embargo Agreement is a supplement to the Scholastic Inc. On-Sale Date Policy Contract, attached hereto as Exhibit B. In pertinent part the Infinity Embargo Agreement provides as follows:

> The undersigned account ("we") [*i.e.*, Infinity] hereby agrees to abide by the embargo of *Harry Potter and the Deathly Hallows* until the national on-sale date of July 21, 2007 (the "On-Sale Date"). If we receive our copies prior to the On-Sale Date, we shall ensure that those books are kept secure . . . and are not sold or distributed and do not leave our secure environment . . . prior to the On-Sale Date. We acknowledge and agree that this embargo prohibits distribution to our staff and distribution of complimentary copies. . . . We further agree to keep the number of our employees with access to the secure environment to the minimum number necessary for our operation.

5

**Any retailers, including on-line retailers, who wish to ship to their customers prior to the On-Sale Date, may do so only with prior written approval from Scholastic. The earliest ship dates allowed will be July 20, 2007. No customer may receive the book prior to the On-Sale Date and any such wishing to early ship to their customers must agree that they shall not ship any copies in any manner or at any time that might allow their customers to receive such copies prior to July 21, 2007.**

\* \* \*

In addition to the consequences which apply to violations of the 2007 Scholastic On-Sale Date Policy, and without limiting Scholastic's rights and remedies, we acknowledge and agree that any store that violates the restrictions found in this Agreement ("Violations") will be subject to the following: (i) **the violating store will be liable for any and all attorney's fees and damages, incurred as a result of such Violations**; Scholastic may withhold re-supply to the violating store of *Harry Potter and the Deathly Hallows,* in whole or in part. . . . Furthermore, we acknowledge and agree that any such Violation will cause irreparable harm to Scholastic and the author, J.K. Rowling, and that monetary damages will be inadequate to compensate for Violations and that, in addition to any other remedies that may be available, at law, in equity or otherwise, Scholastic and/or J.K. Rowling shall be entitled to obtain injunctive relief against any Violation, without the necessity of proving actual damages or posting any bond.

On behalf of the undersigned account, I have read the On-Sale Date Announcement and this Agreement concerning the On-Sale Date for *Harry Potter and the Deathly Hallows* and agree to abide by the conditions set forth above. Furthermore, I will make sure all personnel involved with *Harry Potter and the Deathly Hallows* as our company are informed of, and comply with, this Agreement and its restrictions.   (Underlining Added.)

### Infinity's Breach

18.   On information and belief, Infinity repeatedly violated the Infinity Embargo Agreement in all of the following ways:

- Shipping copies of *Harry Potter and the Deathly Hallows* to customers prior to July 20, 2007;

- Shipping copies of *Harry Potter and the Deathly Hallows* to customers prior to July 20, 2007 without the express prior written consent of Scholastic;

- Causing delivery of copies of *Harry Potter and the Deathly Hallows* to customers prior to July 21, 2007.

6

19. As a consequence of Infinity's violations, Scholastic sustained damages and incurred costs. These costs include expenses incurred in responding to and mitigating the consequences of the early release of the Book by Infinity. Among other expenses, Scholastic incurred the costs of immediately locating and contacting, via phone, the thousands of customers who may have received a copy of the Book prior to July 21, 2007, and working with other retailers to fend off any other early releases of the Book. Scholastic also incurred attorneys' fees and costs to respond to Infinity's breach.

20. Scholastic's damages also include disgorgement of Infinity's profits, including profits realized by Infinity from increased exposure and access to its website due to its sale of the Book.

21. Infinity's breach also caused damage to Scholastic's reputation among authors, distributors and retailers and other publishers.

22. After its breach, despite Plaintiff's repeated requests, Infinity refused to cease marketing and selling the Book through its website.

23. Plaintiff's damages are substantially in excess of $75,000, exclusive of interest and costs.

24. Plaintiff Scholastic demands a trial by jury.

### COUNT I – BREACH OF CONTRACT AGAINST INFINITY

25. Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1 through 24.

26. The Infinity Embargo Agreement is a valid and binding contract supported by consideration.

27. Infinity breached the Infinity Embargo Agreement by shipping *Harry Potter and the Deathly Hallows* to customers prior to July 20, 2007, shipping *Harry Potter and*

7

*the Deathly Hallows* to customers prior to July 20, 2007 without the express consent of Scholastic, and by delivering copies of *Harry Potter and the Deathly Hallows* to customers prior to July 21, 2007.

28. Plaintiff has performed each and every obligation required of it under the Infinity Embargo Agreement.

29. Plaintiff has been injured and will continue to be injured due to Infinity's breach.

WHEREFORE, Plaintiff Scholastic requests that the Court enter a judgment in Scholastic's favor and against Infinity and provide Scholastic the following relief:

A. Order, adjudge and decree that Infinity has materially breached the Infinity Embargo Agreement with Scholastic;

B. Temporarily, preliminarily and permanently restrain and enjoin Infinity from further violations of its contractual obligations under the Infinity Embargo Agreement;

C. Award damages, including but not limited to disgorgement of any profits received by Infinity that relate to the Infinity Embargo Agreement, compensation to Scholastic for harm to its reputation, and Scholastic's attorneys' fees and costs, in an amount to be determined after discovery and such other relief to Scholastic as Scholastic requests and the Court deems appropriate and just.

Dated: September 20, 2007

Respectfully submitted,

*/s/ W—.*
One of the Attorneys for Plaintiff Scholastic Inc.

Kenneth E. Kraus
William B. Berndt
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606-4617
312.701.9300

8

# EXHIBIT A

# 2007
# SCHOLASTIC INC.
# ON-SALE DATE POLICY
# CONTRACT

Please complete and return to:    Helen Boltoon
Scholastic Inc.
557 Broadway – 9th Floor
New York, NY 10012
Fax #: 212/389-3126

*"By completing and submitting this form, I agree to the terms and conditions set forth in the 2007 Scholastic Inc. On-Sale Date Policy"*

ACCOUNT #: _____

ACCOUNT NAME: INFINITY RESOURCES (DEEP DISCOUNT.COM)

STATEMENT ADDRESS: 900 N ROHLWING RD

ITASCA, IL 60143

# OF SHIP-TO LOCATIONS: 3,000 +

PRINTED NAME OF THE SIGNER: ROBERT BRUGGI

TITLE OF THE SIGNER: DIRECTOR OF MERCHANDISING – BOOKS

PHONE # OF THE SIGNER: 630 919-2151

SIGNATURE: [signed]

DATE: 3/10/07

*IF YOU ARE SUBMITTING THIS CONTRACT AS THE CUSTOMER OF A DISTRIBUTOR, DISTRIBUTOR'S NAME:

LEVY

ALL CONTRACTS MUST BE SIGNED AND RETURNED NO LATER THAN March 30, 2007.

## SCHOLASTIC INC.
## HARRY POTTER AND THE DEATHLY HALLOWS
## AGREEMENT
### (RETAILER)
(supplement to the Scholastic 2007 On-Sale Date Policy Contract)

The undersigned account ("we") hereby agrees to abide by the embargo of *Harry Potter and the Deathly Hallows* until the national on-sale date of July 21, 2007 (the "On-Sale Date"). If we receive our copies prior to the On-Sale Date, we shall ensure that these books are kept secure and not placed on the selling floor and/or in any display areas, and are not sold or distributed and do not leave our secure environment (except as set forth below") prior to the On-Sale Date. If we have any retail distribution centers ("RDC"), we acknowledge and agree that this Agreement applies to each such RDC and any redistribution of copies prior to the On-Sale Date through such RDCs shall be only in carton quantities, in Scholastic's original cartons, unless we have Scholastic's prior written approval to redistribute in less than carton quantities. We acknowledge and agree that this embargo prohibits distribution to our staff and distribution of complimentary copies. We further agree not to allow any third parties, including without limitation members of the press and media, into our secure environment unless we have provided Scholastic at least one week's prior written notice and delivered to Scholastic with such notice a signed copy of the enclosed Access Guidelines confirming our agreement to abide by such guidelines, and have obtained Scholastic's prior written approval. Notice and written confirmation of our agreement to comply with the Access Guidelines shall be sent to Scholastic Inc., Attn: Alan Smagler, 557 Broadway, New York, NY 10012, fax # 212-389-3050. We further agree to keep the number of our employees with access to the secure environment to the minimum number necessary for our operation.

* Any retailers, including on-line retailers, who wish to ship to their customers prior to the On-Sale Date, may do so only with prior written approval from Scholastic. The earliest ship date allowed will be July 20, 2007. No customer may receive the book prior to the On-Sale Date and any such retailers wishing to early ship to their customers must agree that they shall not ship any copies in any manner or at any time that might allow their customers to receive such copies prior to July 21, 2007. Requests for an Early Shipping Permission form for permission to ship early should be made in writing to Scholastic Inc., Attn: Helen Boltson, 557 Broadway, New York, NY 10012, or via email to hboltson@scholastic.com with the subject "Request for Early Shipping Permission", or via fax to 212-389-3126.

Scholastic will make available a Book Promotional Style Guide that contains materials and guidelines for the advertising and promotion of *Harry Potter and the Deathly Hallows* and all related communications. We acknowledge and agree that all communications relating to any and all Harry Potter books, including without limitation *Harry Potter and the Deathly Hallows* (including without limitation advertising and promotional materials, press releases, media alerts and all communications with the media), must comply with the Book Promotional Style Guide and be submitted to Scholastic for prior written approval.

In addition to the consequences which apply to violations of the 2007 Scholastic On-Sale Date Policy, and without limiting Scholastic's rights and remedies, we acknowledge and agree that any store that violates the restrictions found in this Agreement ("Violations") will be subject to the following: (i) the violating store will be liable for any and all attorney's fees and damages, incurred as a result of such Violations, (ii) Scholastic may withhold re-supply to the violating store of *Harry Potter and the Deathly Hallows*, in whole or in part, and (iii) Scholastic will not early ship to the violating store any future Harry Potter or other embargoed titles until the corresponding on-sale date. Furthermore, we acknowledge and agree that any such Violation will cause irreparable harm to Scholastic and the author, J.K. Rowling, and that monetary damages will be inadequate to compensate for Violations and that, in addition to any other remedies that may be available, at law, in equity or otherwise, Scholastic and/or J.K. Rowling shall be entitled to obtain injunctive relief against any Violation, without the necessity of proving actual damages or posting any bond. If we are an account with multiple stores, we acknowledge and agree that in the event one of our stores commits a Violation, we may be held jointly liable with the violating store for such Violation and subject to the foregoing.

All other terms and conditions of the 2007 Scholastic On-Sale Date Policy still apply and remain in full force and effect. Scholastic intends to monitor the *Harry Potter and the Deathly Hallows* laydown very closely and appreciates your complete cooperation.

On behalf of the undersigned account, I have read the On-Sale Date Announcement and this Agreement concerning the On-Sale Date for *Harry Potter and the Deathly Hallows* and agree to abide by the conditions set forth above. Furthermore, I will make sure all personnel involved with *Harry Potter and the Deathly Hallows* at our company are informed of, and comply with, this Agreement and its restrictions.

Date: 3/10/07    Account number**: _____

Signature: _____

Printed name of the signer: ROBERT BROGGI

Phone number of the signer: 630 919-2131

Account name: INFINITY RESOURCES INC (DEEP DISCOUNT.COM)

(** If you are submitting this to the customer of a distributor, Distributor's Name: LEVY )

Statement address: 900 N ROHLWING RD    (Street)

ITASCA, IL 60143    (City, State, Zip Code)

This Agreement must be signed and returned no later than March 30, 2007 to: Helen Boltson, Scholastic Inc., 557 Broadway, 8th Floor, New York, NY 10012. Fax #: 212-389-3126

# EXHIBIT B

# SCHOLASTIC

## 2007 SCHOLASTIC INC. ON-SALE DATE POLICY

Scholastic is committed to providing a fair and equitable distribution of its titles to all of its customers. Some titles ("Restricted Titles") are subject to an "on-sale date" to which all distributors and retailers must abide. Scholastic will notify you, either directly or through trade publication notices, of which titles will be treated as Restricted Titles and the related on-sale dates. In order for you to receive copies of Restricted Titles before the on-sale date to facilitate distribution and re-sale to your customers and to ensure fair distribution for all booksellers, Restricted Titles will be subject to the following:

1. All releases of Restricted Title cartons will be clearly marked with the on-sale date. Please call 800-242-7737 to report violations.
2. Your receipt of Restricted Titles in advance of the on-sale date will be permitted solely to allow you to process your shipment for redistribution/resale in accordance with the terms hereof.
3. You must ensure that Restricted Titles are kept secure and not placed on any selling floor and/or in any display areas, and are not sold or otherwise distributed (including without limitation to your staff) and do not leave your secure environment prior to their on-sale date. All resellers must ensure that their accounts/retail locations are aware of and abide by the on-sale dates. Distributors, as well as retailers redistributing to their retail locations, must provide to their accounts/retail locations clear, explicit written instructions appropriate for both full carton and less than full carton quantities.

4. **Retailers**

   A. Any retail location that sells, displays or otherwise distributes a Restricted Title prior to its on-sale date for the **first time** will be required immediately to take the Restricted Title off sale until the on-sale date and will be placed on a watch list for 12 months following this first violation.
   
   B. Any retail location that sells, displays or otherwise distributes a Restricted Title prior to its on-sale date a second time while on the watch list will not be shipped Restricted Titles until the on-sale date for the duration of the 12 month period (i.e., Scholastic will not ship from its warehouse or other facility until the on-sale date).
   
   C. No retail customers, including on-line retailers, may allow Restricted Titles to arrive at their customer's address ahead of the on-sale date. Retailers may ship copies the day before the on-sale date to arrive on the on-sale date (but not before) provided that they obtain Scholastic's prior written approval no less than thirty (30) days prior to the on-sale date.

**SCHOLASTIC**

5. Distributors/Retail Distribution Centers

   A. Any distributor/retail distribution center that ships a Restricted Title to a retail location that violates the On-Sale Date Policy for the first time, will be responsible for calling and instructing the retail location to take the title off sale and secure all copies until the on-sale date. In addition, the distributor/retail distribution center and all violating retail locations will be placed on a watch list for the 12 months following this first violation.

   B. Should a retail location on the 12 month watch list violate the On-Sale Date Policy a second time, the distributor/retail distribution center will be required to not ship Restricted Titles to the violating retail location until the on-sale date (i.e., the distributor/retail distribution center will not ship from its warehouse or other facility until the on-sale date).

   C. Distributors/Retail Distribution Centers will be responsible for ensuring their accounts/retail locations comply with this On-Sale Date Policy. Any distributor/retail distribution center that fails to cooperate with Scholastic in enforcing the above terms with its accounts/retail locations, or that violates the On-Sale Date Policy itself, may itself be subject to penalties as Scholastic deems appropriate.

6. Notwithstanding the terms of this policy, Scholastic reserves the right to review any account's compliance record with this policy, and to take appropriate action if necessary. Certain Restricted Titles may warrant variation from or supplements to this policy and you will be notified in advance of any such situations. These terms are subject to change upon notice.